NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ESTATE OF FLORENCIO MORALES, JR., et al., | : : : | **Civil Action No. 05-5423 (SRC)** |
| Plaintiffs, | : : | **OPINION** |
| v. | : : | |
| CITY OF JERSEY CITY, et al., | : : | |
| Defendants. | : : | |

**CHESLER**, District Judge

This matter comes before the Court upon three motions for summary judgment.  The first

motion, a motion for partial summary judgment as to liability on certain claims, was filed by

Plaintiffs Estate of Florencio Morales, Jr., Florencio Morales, Ivette Morales, Maria Nieves and

Ana Burgos [docket item no. 50].[1]  Defendants City of Jersey City, Officer Ralph Sarao, Officer

Vincent Cook and Officer James Crecco (collectively, the "Jersey City Defendants") later filed

their own motion for summary judgment on the entirety of the Amended Complaint [docket item

---

[1] When the motion was filed, various family members of the deceased Florencio Morales, Jr. were also pursuing claims in this action.  On the record of oral argument, most of the other named plaintiffs, specifically Ivette Morales, Maria Nieves and Ana Burgos, abandoned all claims they asserted in this action.  Florencio Morales, father of the deceased, remains a plaintiff in this matter but wishes to proceed only on the wrongful death claim.

For purposes of clarity, and unless otherwise noted, the Court will refer to a singular Plaintiff, the Estate of Florencio Morales, Jr., who will hereinafter be referred to as "Plaintiff" or "Morales."  To distinguish Morales from his father Florencio Morales, Sr., the Court will refer to the father as "Florencio Morales, Sr."

no. 65].  Defendants Wilfred Sa-Onoy and Andrew Sa-Onoy (collectively, the "Sa-Onoy

Defendants" or the "Sa-Onoys") separately moved for summary judgment on Plaintiff's assault

and battery claims [docket item no. 67].  All of the motions have been opposed.  The Court heard

oral argument on the motions on May 18, 2009 and on May 20, 2009.  The Court has considered

the papers submitted and arguments made by the parties in connection with these motions.  For

the reasons expressed in this Opinion, the Court will dispose of the three motions at bar as

follows: The Court will deny Plaintiff's motion for partial summary judgment.  It will grant the

Jersey City Defendants' motion for summary judgment as to Plaintiff's claims against Officers

Sarao, Cook and Crecco, deny their motion as to Plaintiff's civil rights claim against the City of

Jersey City and grant their motion as to all state law claims. Finally, the Court will deny the Sa-

Onoy Defendants' motion.


I.      **BACKGROUND**

        This action arises out of the October 12, 2004 arrest and death of Florencio Morales, Jr.

in Jersey City, New Jersey.  The events giving rise to this lawsuit were set in motion when, on

that date, at approximately 9:30 p.m., Andrew Sa-Onoy observed someone wearing a dark-

hooded sweatshirt come out of the backyard shed of the Jefferson Avenue home Andrew Sa-

Onoy shared with his brother, Wilfred, and other family members.  Andrew Sa-Onoy became

suspicious when he observed an unfamiliar bicycle leaning against his car as he was out walking

his dog.  Andrew Sa-Onoy went into his house and told his brother that he believed an intruder

may be in the house.  The brothers checked the house and then the backyard.  While in the yard,

they saw a person they described as an olive-skinned man exit the shed carrying a bag of items

and suspected that they had been burglarized.  The intruder threw the bag at Andrew Sa-Onoy and jumped over the fence into a neighboring yard.  The Sa-Onoys lost sight of the intruder but Andrew went to the corner of Jefferson and Oakland Avenues, in the direction the intruder would be heading, to look for him.  Andrew Sa-Onoy saw the intruder jump over a gate and start running down Jefferson Avenue towards Central Avenue.

The brothers chased the intruder, though it is not clear how much time elapsed between the Sa-Onoys' encounter with the intruder in their yard and the chase of the individual they believed to be the intruder.  From the Sa-Onoys' deposition testimony, it would appear to have been an interrupted pursuit.  However, the account given by two neighbors interviewed by the Hudson County Prosecutor's Office suggests that the Sa-Onoy Defendants did not seamlessly follow the man observed coming out of the shed from their yard and onto the street.  The neighbors, Quinto Soto and Ilma Anico, stated that at about 9:30 or 9:45, while taking out the garbage, they observed what appeared to be a black male wearing black clothing climbing the fence of their yard on Oakland Avenue.  They lost sight of him once he jumped into the neighboring yard.  Soto and Anico walked over to Jefferson Avenue and spoke with the Sa-Onoys.  At about that time, Anico observed saw the man she had first seen in her yard walking on Jefferson toward Central.  The Sa-Onoys began to walk in pursuit of the man, who then began to run away.

According to Andrew Sa-Onoy's deposition testimony, when the brothers gave chase, they intended to have the man arrested.  He also testified that before starting the chase, he heard his sister-in-law making a 911 call for help.  The Sa-Onoy brothers caught up with Morales, whom they believed to be the intruder, at about the intersection of Central and Laidlaw Avenues.

3

Plaintiff's statement of facts maintains that Andrew Sa-Onoy was carrying a metal broomstick or mop handle during the chase and then used it to attack him.  Andrew admits swinging a broomstick at Morales, but the Sa-Onoys deny striking or beating Morales.  It is, however, undisputed, that the chase culminated with the Sa-Onoys tackling Morales.  According to their testimony, the police arrived almost immediately after that.

Indeed, Officers Sarao and Cook were in their patrol car when they heard a call over their radio about a burglary in progress in the area of Jefferson and Central Avenues.  They decided to head in that direction.  Prior to arriving at the robbery scene, the officers came upon what was in their observation two Asian males fighting with one Hispanic male.  When deposed, Officer Sarao described what he observed upon arriving at the scene: The three men were on their feet at first, with one Asian male holding the Hispanic by the waist and trying to pull him down.  The men went to the ground as the patrol car approached.  In Officer Sarao's initial assessment, the incident as a mutual fight, with punches being thrown back and forth.  Officer Sarao testified that Morales was bruised and bleeding from his nose or mouth.

Officer Sarao broke up the fight.  He asked the men what was happening, and one of the Sa-Onoy brothers responded that the restrained individual, Morales, had just broken into the brothers' home.  Officer Sarao, who was in uniform at the time, identified himself and instructed the Sa-Onoy brothers to step away from Morales.  He informed Morales he was going to hold him for investigation and place Morales in handcuffs.  Officer Sarao heard Morales say he couldn't breathe, but according to Officer Sarao, Morales struck him in the chest before he was able to follow up on that statement.  It is undisputed that a physical struggle between Morales and the police ensued, but Plaintiff and Defendants recount very different versions of what happened.

4

The Court summarizes the altercation from its own review of the record provided by the parties.[2]

According to deposition testimony given by Officer Sarao, even before Officer Sarao was able to handcuff Morales, Morales cursed and spit at Officer Sarao and head-butted his chest. Officer Cook assisted Officer Sarao in restraining Morales, and they held him prone against the ground. Morales banged his head on the ground, and in an attempt to stop Morales from banging his head, Sarao first grabbed Morales by the collar of his shirt and then by the hair. This lasted only seconds, after which the officers succeeded in handcuffing Morales. Morales, however, continued to struggle, yelling and banging his head on the ground. The officers lifted Morales up off the ground to prevent him from continuing to bang his head, but as they lifted him up, Morales brought his handcuffed hands from the back of his body to the front. Morales lunged at Officer Sarao, ripping his pant leg and almost knocking him to the ground. Officer Sarao testified that he pushed Morales away "as hard as [he] could" causing Morales to hit the patrol car and fall to the ground. Morales began losing consciousness. Officer Sarao called for an ambulance and kneeled on the ground next to Morales, who was sitting next to the patrol car, trying to keep him upright. He also talked to Morales, asking him who he was and why he was saying he couldn't breathe. He testified that Morales did not inform him that he was asthmatic or mention an asthma pump. Moreover, Officer Sarao testified that he did not see an asthma pump on or near Morales, even during a pat-down search performed at some point during this incident. At first, Morales continued yelling and cursing, but when he stopped talking, Officer Sarao

---

[2] The Court feels compelled to note that, by and large, the facts have not been comprehensively summarized with clear and accurate citations to the record, leaving to the Court the task of combing through what depositions transcripts (or, often, snippets thereof) and documents the parties supplied to try to piece together the pertinent facts.

radioed a rush on the ambulance, according to his deposition testimony.  He also performed a technique which involved rubbing Morales's sternum and which was intended to keep him conscious.  It was his impression that Morales's behavior indicated he was under the influence of drugs.

At about or shortly before this point in time, two other police officers, Officer Crecco and his partner Officer Infantes also arrived.[3]  Officer Crecco testified that when he arrived he saw Officer Sarao kneeling next to a handcuffed Morales, who was sitting on the ground.  Officer Cook was talking to the Sa-Onoys.  Officer Crecco observed that Morales was sweating profusely and drooling.  Officer Sarao was checking his vital signs.  Officer Crecco also checked Morales's pulse, which seemed steady to him.  Officer Crecco did not know whether an ambulance had already been called and placed his own call for one.  He testified that within moments, a rush was put on the ambulance because it appeared that Morales was going unconscious and having trouble breathing.  He also testified that he cannot recall whether he requested the rush himself or told Officer Sarao or another of the officers to do it.

At the scene, meaning the intersection of Central and Laidlaw Avenues, Officer Crecco observed a bent metal broomstick or mop handle and an asthma pump.  Officer Crecco described the broomstick or mop handle as thin, not of the heavy aluminum kind, and had no knowledge of how it was bent.  As for the asthma pump, Officer Crecco observed it on the ground, about a foot

---

[3] Though Officer Crecco was named as a defendant in the Amended Complaint, Plaintiff stated at oral argument that, in light of the lack of evidence, he did not wish to pursue his claims against Officer Crecco.  The Court reasonably understands this to be a concession that Plaintiff cannot prevail on his claims against Officer Crecco as a matter of law, and the Court will accordingly grant summary judgment in favor of Officer Crecco on all claims asserted against him in the Amended Complaint.

away from Morales near or among some street garbage.  Officer Crecco said he discovered it while scanning the area to see if Morales had thrown anything, such as contraband.  He picked the inhaler up, but could not recall at the time of his deposition whether it was labeled with Morales's name.  Officer Crecco explained that he did not give the inhaler to Morales because Morales's name was unknown to the officers.  He explained that he would not give medication to someone without knowing that it belonged to that person, especially given the danger of incorrectly administering asthma medication to a non-asthmatic.  He testified that the officers tried asking Morales questions, but at this point Morales's breathing was labored and he was not responding.  Moreover, in Officer Crecco's assessment, Morales's labored breathing was not necessarily indicative of asthma and was also consistent with the signs of a drug overdose, which he believed to be the case based on his training.

Once the medical responders arrived, the officers ceased to have any involvement with Morales.  According to the summary of events provided in the report of Dr. Howard Adelman, a forensic pathologist hired by Plaintiff, an ambulance arrived at 9:41 p.m.[4]  The medical responders found Morales supine, unresponsive and in cardiac arrest.  They performed CPR and transported the patient to the hospital, but the resuscitation efforts were unsuccessful.  Morales was pronounced dead at 10:32 p.m., shortly after his arrival at Jersey City Medical Center.  At that point, Morales remained unidentified, as he was throughout the entire incident involving the police officers.

_____

[4] Dr. Adelman's report states that it is based on review of, among other things, two different reports from the Jersey City Police Department and several Jersey City Medical Center reports.  Source documents providing the exact timeline pertaining to the summoning and administration of medical assistance have not been provided to the Court.

It is not clear at what time Officers Sarao and Cook arrived on the scene of the fight or attack involving Morales and the Sa-Onoy brothers, nor is it clear at what time the first call for an ambulance was radioed by police.[5]  Officer Sarao estimates that approximately three minutes elapsed between his arrival at the scene and the first call for the ambulance and that another seven or eight minutes passed between the call for the ambulance and its arrival.

The next morning, on October 13, 2004, Dr. Nobby C. Mambo, Assistant Medical Examiner for the State of New Jersey Regional Medical Examiner's Office, performed an autopsy on the body.  Based on fingerprints and a New Jersey photo identification card, the body was identified as Florencio Morales, Jr..  Regarding the condition of Morales's body, Dr. Mambo noted multiple superficial abrasions of the face, puncture wounds and hemorrhage in the lips and multiple minor skin abrasions. A toxicology screen revealed the presence of cocaine, morphine and other drugs in Morales's system.  Dr. Mambo determined that the cause of death was multi-drug toxicity with bronchial asthma as a contributory cause.  At the request of Morales's family, a second autopsy was performed by Dr. Duc Van Duong, an independent forensic pathologist. Dr. Van Duong determined that the cause of death was cardiac arrest due to acute mixed drug intoxication and bronchial asthma.  Thereafter, Plaintiff retained Dr. Howard Adelman to perform his own review of the record, including the two autopsy reports and various police and hospital reports relating to the October 12, 2004 incident.  Dr. Adelman expressly disagreed with the conclusion that the cause of death was multi-drug intoxication, noting that the drug levels were not high enough, even in combination, to have caused death.  He further opined that given

---

[5] The Court also notes that it has not been provided with any record of the radio transmissions.

the facts of Morales's struggle with the Sa-Onoy brothers and the police, he suffered a violent death not a drug overdose.  He noted many physical signs consistent with asphyxia caused by an asthmatic attack, such as hyperinflated lungs and petechial hemorrhages around the eyes.  Dr. Adelman concluded that the cause of death was "respiratory asphyxia due to an acute asthmatic attack and a traumatic or positional asphyxia brought on by the physical struggle."  (Walrod Cert., Ex. J at 5.)

Morales was in fact asthmatic, a fact that is not disputed.  According to his family members who were deposed, Morales would jump up and down gasping for air during an asthma attack.  His father testified that, due to this condition, his son had an asthma pump.

Plaintiff's civil rights lawsuit, filed in this Court on November 16, 2005, in fact focuses on the police officers' failure to detect Morales's asthmatic condition and handle the situation accordingly and, additionally, on the Jersey City Police Department's failure to train the officers on awareness and prevention of sudden in-custody death syndrome.  Jersey City Police Department Deputy Chief Peter Nalbach, a witness produced by the Jersey City Defendants to testify as to the department's internal affairs practices and its training and supervision of officers, explained that sudden in-custody death syndrome occurs when someone dies for unknown reasons while in police custody.  He further explained that it is usually due to being under the influence of drugs but could also occur as a result of a physical altercation with the person in custody or that person's asthmatic condition.  Deputy Chief Nalbach also testified that he is aware that approximately four to five years before the date of his deposition, taken on September

24, 2007, the Jersey City Police Academy began providing such training.  No evidence has been presented to the Court regarding training of officers who had graduated from the academy before the training was provided.

## II.   DISCUSSION

The Amended Complaint pleads various causes of action, including some that are indisputably not cognizable, such as the claim for violation of civil rights asserted against the Sa-Onoy brothers.  Based on the briefing submitted on the three summary judgment motions before the Court and representations made by Plaintiff at oral argument, the Court notes that Plaintiff wishes to proceed on the following claims: (1) claim under 42 U.S.C. § 1983 against Officer Sarao for use of excessive force; (2) section 1983 claim against Officers Sarao and Cook for inadequate attention to Plaintiff's medical needs; (3) section 1983 claim against Jersey City for its policy or practice of failing to train officers on sudden in-custody death syndrome; (4) negligence claim under the New Jersey Tort Claims Act against Officers Sarao and Cook based on inadequate medical assistance; (5) assault and battery claims under the New Jersey Tort Claims Act against Officer Sarao; (6) assault and battery claims against Wilfred and Andrew Sa-Onoy; and (7) wrongful death claim by Florencio Morales, Sr. against all Defendants.

Before the Court are three motions for summary judgment.  Plaintiff's motion, the first filed, seeks partial summary judgment on his section 1983 claim against Jersey City based on failure to train and on his assault and battery claims against the Sa-Onoy brothers.  The motion filed by the Jersey City Defendants seeks summary judgment on all claims.  The Sa-Onoy Defendants move for summary judgment on the assault and battery claims.

The standard upon which a court must evaluate a summary judgment motion is well-established.  Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000).  In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party.  See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 247-48.  The Supreme Court has held that and Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but  "must exceed the 'mere scintilla'

11

threshold").

The Court will analyze whether summary judgment is warranted on each claim on which Plaintiff wishes to proceed, as identified above, dealing first with the civil rights claims, then with the state law tort claims.

**A.      Civil Rights Claims Against the Jersey City Defendants**

Plaintiff asserts that Officer Sarao, Officer Cook and the Jersey City Police Department violated his rights under the United States Constitution in a number of ways.  He seeks relief against them pursuant to the cause of action established by 42 U.S.C. § 1983, which provides for civil redress of a constitutional violation committed by a person acting under color of state law.  That statute provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

28 U.S.C. § 1983.  To establish a claim under section 1983, a plaintiff must demonstrate that the challenged conduct was committed by (1) a person acting under color of state law and (2) that the conduct deprived him of rights, privileges, or immunities secured by the Constitution or the laws of the United States.  See Parratt v. Taylor, 451 U.S. 527, 535 (1981).

There is no dispute that as to the civil rights claims asserted in this case, the Jersey City Defendants were acting under color of state law.  The Court's analysis of the following section 1983 claims therefore focuses on the second element.

1.    Excessive Force Claim Against Officer Sarao

The Jersey City Defendants argue that Officer Sarao is entitled to qualified immunity on Plaintiff's claim that Officer Sarao used excessive force in arresting him, in violation of the Fourth Amendment.  The Court agrees.

Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).  The Supreme Court has held that whether a defendant is entitled to qualified immunity is a question for the court, not the jury, and should be decided early in the proceedings so that the defendant may avoid the burdens of litigation and thus enjoy the immunity to which he or she is entitled.  Saucier v. Katz, 533 U.S. 194, 200-01 (2001).  The Saucier court explained that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Id. at 205.

A court conducting a qualified immunity analysis in a section 1983 action must apply a two-pronged analysis.  Id. at 201.  The court must first consider whether, taking the facts in the light most favorable to the party asserting the injury, the facts demonstrate that the conduct of the state actor defendant violated a constitutional right.  Id.  The Third Circuit has held that "[i]f the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002).  If the facts do make out a constitutional violation, then the court proceeds to the second step of the inquiry, which asks whether the right

was clearly established.  Saucier, 533 U.S. at 201.  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson, 483 U.S. at 640.  If the right was not clearly established, the state actor is entitled to qualified immunity.  Saucier, 533 U.S. at 202.

 With regard to the excessive force claim against Officer Sarao, the Court need not proceed past the threshold question of the qualified immunity analysis because, on the record before the Court, Plaintiff cannot establish that his Fourth Amendment guaranty against the use of excessive force was violated.  To establish a claim of excessive force, a plaintiff must demonstrate that, under the totality of the circumstances, the officer's actions were not objectively reasonable in light of the facts and circumstances confronting the officer.  Estate of Smith v. Marasco, 318 F.3d 497, 515 (3d Cir. 2003) (citing Graham v. Connor, 490 U.S. 386, 397 (1989)).  The Third Circuit has held that reasonableness may be determined by considering various factors, including in relevant part to this litigation, whether the plaintiff was actively resisting arrest.  Id. (citing Graham, 490 U.S. at 396).  Moreover, the Third Circuit has heeded the Supreme Court's direction in Graham that the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation."  Id. at 516 (quoting Graham, 490 U.S. at 396-97).

 Though Plaintiff alleges that Officer Sarao slammed him against the patrol car, he proffers no admissible evidence to support this allegation.  Plaintiff points to the transcript of an

14

unsworn tape-recorded statement made by Nikolaos Tzouros, an eyewitness to the incident, to

Morales's sister, Ana Burgos, on some date prior to his January 2007 deposition.  In that

statement, Tzouros asserts that he saw Officer Sarao pick up a handcuffed Morales and slam him

against the patrol car.  Tzouros's unsworn, out-of-court statement to Burgos giving his version of

events is inadmissible hearsay evidence.  Apart from its inadmissibility, the unsworn statement is

squarely contradicted by Tzouros's sworn deposition testimony that he heard a loud bang during

the arrest but did not see what actually caused it.  The evidence in the record that the Court may

consider demonstrates that Morales was struggling to avoid being handcuffed and once

handcuffed lunged at Officer Sarao, ripping his pant leg.  Officer Sarao testified that he pushed

Morales away forcefully and that when he did so, Morales struck the patrol car with an audible

noise.  He also explained that he in fact did grab Morales by his shirt and by his hair during the

struggle to restrain him in an effort to prevent Morales from slamming his head against the

pavement and further injuring himself.  Plaintiff has not come forward with any admissible

evidence to refute this version of events as supported by the record.  In light of the totality of

circumstances facing Officer Sarao on the scene of the incident, the Court finds that the force he

employed was objectively reasonable as a matter of law.  See Kopec v. Tate, 361 F.3d 772, 777

(3d Cir. 2004) (holding that summary judgment is appropriate on excessive force claim where,

after resolving all factual disputes in favor of plaintiff, district court concludes that use of force

was objectively reasonable under circumstances).

As no constitutional violation can be demonstrated by Plaintiff, Officer Sarao has met his

burden of establishing that he is entitled to qualified immunity on the excessive force claim.

Accordingly, the Court will grant the Jersey City Defendants' motion for summary judgment as

to the excessive force claim against Officer Sarao.

2. <u>Inadequate Medical Attention Claim Against Officers Sarao and Cook</u>

The Jersey City Defendants argue that qualified immunity for Officers Sarao and Cook also warrants summary judgment on Plaintiff's section 1983 claim against them for allegedly violating his Fourteenth Amendment due process right to adequate medical assistance. Again, applying the <u>Saucier</u> qualified immunity analysis, the Court agrees.

Officers Sarao and Cook have demonstrated that they are entitled to qualified immunity on this claim because, per the first step of the <u>Saucier</u> test, Plaintiff as a matter of law cannot establish a constitutional violation by the officers. This conclusion requires a discussion of the standard of culpability the Court finds that Morales would have to demonstrate to establish that the officers deprived him of substantive due process in failing to summon medical assistance promptly, as Plaintiff alleges.

Generally, in cases involving claims that a person's substantive due process rights have been violated by inadequate attention to the person's medical needs, the plaintiff needs to show, on a subjective standard, that the state actor acted with deliberate indifference to a serious medical need, in other words, in conscious disregard of "a substantial risk of serious harm." <u>Farmer v. Brennan</u>, 511 U.S. at 825, 836 (1994); <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999). In this case, given the circumstances of the minute-by-minute decisions required of Officers Sarao and Crecco, Plaintiff would have to demonstrate a level of culpability greater than subjective deliberate indifference. <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 854 (1998) ("<u>Lewis</u>"); <u>Ziccardi v. City of Philadelphia</u>, 288 F.3d 57, 66-67 (3d Cir. 2002). Rather, the facts of this case bring the due process analysis more in line with the "shocks the conscience" standard

16

adopted by the Supreme Court in Lewis.  Lewis, 523 U.S. at 854; Schieber v. City of Philadelphia, 320 F.3d 409, 417-18 (3d Cir. 2003); Ziccardi, 288 F.3d at 66-67.

In Lewis, the Supreme Court applied a "shocks the conscience" standard to evaluate claims of substantive due process violations in a high-speed police pursuit, that is, in a situation calling for quick decision-making by state actors.  Lewis, 523 U.S. at 853.  In establishing this standard, the Supreme Court contrasted the circumstances faced by state actors in handling medical treatment of pretrial detainees with those faced in a prison riot.  Id.  In the former, deliberation about the proper course of conduct is both feasible and obligatory, making the "subjective deliberate indifference" standard appropriate in evaluating whether one's substantive due process rights have been violated.  Id. at 851.  In the latter, where police officers's decisions are "necessarily made in haste, under pressure, and frequently without the luxury of a second chance," the Lewis court reasoned that the deliberate indifference standard is insufficient.  Id. at 852 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).

The Third Circuit has held that Lewis teaches several lessons:

> The first, of course, is that negligence is not enough to shock the conscience under any circumstances. The second is that more culpability is required to shock the conscience to the extent that state actors are required to act promptly and under pressure. Moreover, the same is true to the extent the responsibilities of the state actors require a judgment between competing, legitimate interests.

Schieber, 320 F.3d at 419.  Accordingly, the standard articulated in Lewis has been applied by the Third Circuit in various contexts, apart from police pursuits, in which the state actor has been required to act under pressure and without the luxury of deliberation.  See id. at 417 (citing cases in which Third Circuit has applied the "shocks the conscience" standard). Of particular relevance

to this action, the Third Circuit held that a substantive due process claim required more than subjective deliberate indifference in <u>Ziccardi</u>, a case in which a plaintiff sought recovery under section 1983 against fire department paramedics whom he alleged violated his substantive due process rights by mishandling him and causing his quadriplegia.  <u>Ziccardi</u>, 288 F.3d at 58-59. The <u>Ziccardi</u> court held that in such a context, which may not involve a split-second decision but would require the paramedic to act in a matter of minutes, the plaintiff must show "something more than deliberate indifference, which requires (in the sense applicable here) that a person consciously disregard[ed] 'a substantial risk of serious harm.'" <u>Id.</u> at 66 (quoting <u>Farmer</u>, 511 U.S. at 836).  In such a case, the Third Circuit required "proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result if, knowing Smith [the plaintiff] was seriously injured, they moved Smith without support for his back and neck." <u>Id.</u>

The basis of Morales's inadequate medical assistance claim is that Officers Sarao and Cook failed to call an ambulance in spite of Plaintiff's obvious respiratory distress and/or asthmatic attack.  Plaintiff argues that had the officers been trained in sudden in-custody death syndrome and the risk of positional asphyxia, especially in an asthmatic suspect, they would have called for medical assistance immediately.  Though the Court does not have an exact timeline of the incident, pinpointing the minute at which the officers approached Morales and the minute at which the first call for an ambulance was made, it is clear that the officers were involved in a fast-moving event.  The situation called for on-the-spot decisions by the officers and presented them with the competing tasks of restraining a burglary suspect who was apparently resisting arrest and identifying and dealing with his medical condition.

The facts in the record cannot support a conclusion that the officers consciously disregarded a great risk of serious harm to Morales.  The Jersey City Defendants concede that Officers Sarao and Cook were not trained in handling arrests to avoid sudden in-custody death. Officer Sarao's deposition testimony demonstrates that he believed initially that Plaintiff's complaints of trouble breathing were related to his struggle with the Sa-Onoy brothers and that any respiratory distress was inconsistent with Morales's yelling at and fighting with him. Officer Sarao also testified that once he did perceive Morales to be in distress, when he seemed to be losing consciousness, he called an ambulance; this testimony echoes Officer Sarao's police report, which also notes that the called an ambulance.  Though Plaintiff argues that Officer Sarao's assertion that he called for medical assistance is contradicted by Officer Crecco's testimony regarding calls for an ambulance, the deposition transcripts to the Court belie this argument.  Officer Crecco testified that when he arrived on the scene he did not know whether a call for an ambulance had already been made and therefore made one himself.  As to the rush put on the ambulance, Officer Sarao testified that he put the rush on the call, whereas Officer Crecco testified that he said a rush should be placed and could not remember whether he called in the rush himself or whether another officer on the scene did it.  Additionally, Officer Sarao testified that he performed a technique on Morales to try to keep him conscious while they waited for the ambulance to arrive.  Plaintiff's argument that Officer Sarao's failure to provide Morales with his asthma pump is also unavailing with respect to this substantive due process claim.  Officer Sarao testified that he did not see an asthma pump on the scene, and though he performed a pat-down search of Morales, did not discover it on his person, which is consistent with the police report's inventory of items discovered during the pat-down.  As for Officer Cook's actions with respect to

Plaintiff's need for medical assistance, the record lacks any evidence that he knew that Morales was in respiratory distress and acted with "conscious disregard" of a great risk that he could suffer serious injury or death as a result.  In short, Morales has proffered no evidence that Officers Sarao and Cook knew that he was suffering an asthmatic attack and then, knowing this, recklessly failed to summon medical help in manner that shocks the conscience.

Accordingly, the Court will grant the Jersey City Defendants' motion for summary judgment on Plaintiff's section § 1983 claim against Officers Sarao and Cook for failure to provide prompt medical assistance.

### 3.   Failure to Train Claim Against Jersey City

Both Plaintiff and the Jersey City Defendants move for summary judgment on the failure to train claim asserted against Jersey City.  The theory of this claim is that the Jersey City Police Department's failure to train its officers to recognize and respond to the critical medical needs of suspects, and specifically in this case to train on positional asphyxia and sudden in-custody death syndrome, violated Morales's substantive due process rights under the Fourteenth Amendment and that this constitutional violation caused Officers Sarao and Cook to handle the October 12, 2004 incident improperly.[6]

Liability under section 1983 against a municipal entity such as the Jersey City Police Department must be premised on a deprivation of rights as a result of a custom or policy of the

---

[6] Though Plaintiff and the Jersey City Defendants appear to quibble over whether the City of Jersey City or the Jersey City Police Department is pled as the nominal defendant, the Court treats the claim as one against the municipality, in accordance with well-settled Third Circuit law.  See Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997) (stating that for purposes of section 1983 liability, the municipality and its police department are treated as a single entity).

entity.  Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690, 694 (1978);  Simmons v. City of Phila., 947 F.2d 1042, 1064 (3d Cir.1991), cert. denied, 503 U.S. 985 (1992). Municipal liability for civil rights violations does not arise under a theory of respondeat superior. Monell, 436 U.S. at 691.  Rather, "municipal liability under § 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembauer v. City of Cincinnati, 475 U.S. 469, 483 (1986).  In a failure to train claim, this means that liability may only attach when the failure amounts to the municipality's deliberate indifference to the rights of persons with whom the police come into contact.  City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989).  To establish that a municipality's failure to train amounts to deliberate indifference, a plaintiff must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (citing Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal footnote omitted).  Moreover, to prevail on a Monell claim for failure to train, a plaintiff must also "show that the city's policy actually caused a constitutional injury."  Fagan v. City of Vineland, 22 F.3d 1283, 1291 (3d Cir. 1994) (citing Canton, 489 U.S. at 389-90.)  In short, to establish municipal liability on a failure to train claim, a plaintiff must prove that the failure to train reflects a deliberate or conscious choice by city policymakers and that the municipality's policy caused a constitutional injury.  Canton, 489 U.S. at 389-90.)

Dealing specifically with a <u>Monell</u> claim for failure to train arising out of a police pursuit resulting in substantive due process violations, the Third Circuit held that a municipality may be liable for a substantive due process violation even if none of the individual officers violated the Constitution. <u>Fagan</u>, 22 F.3d at 1292. It reasoned as follows:

> A finding of municipal liability does not depend automatically or necessarily on the liability of any police officer. Even if an officer's actions caused death or injury, he can only be liable under section 1983 and the Fourteenth Amendment if his conduct "shocks the conscience." The fact that the officer's conduct may not meet that standard does not negate the injury suffered by the plaintiff as a result. If it can be shown that the plaintiff suffered that injury, which amounts to deprivation of life or liberty, because the officer was following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights. The pursuing police officer is merely the causal conduit for the constitutional violation committed by the City.

<u>Id.</u> (internal citation and footnote omitted). Thus, this Court's finding that, as a matter of law, Plaintiff cannot establish that Officers Sarao and Cook violated the Fourteenth Amendment in failing to provide the medical assistance to which Plaintiff claims a constitutional right does not automatically result in a similar finding that Jersey City cannot be liable for a due process violation in failing to train the officers appropriately.

In fact, the Court finds that Plaintiff has surmounted the Rule 56 challenge to his <u>Monell</u> failure to train claim. Plaintiff has come forward with evidence that the Jersey City Police Department deliberately failed to train the responding officers in recognizing and handling persons suffering asthmatic attacks, including the danger of positional asphyxia, and that this deliberate indifference to the substantive due process rights of persons such as Morales in fact

caused him to suffer such a deprivation at the hands of the responding officers.  The Jersey City

Defendants do not dispute that Officers Sarao, Cook and Crecco, who graduated from the police

academy before the training program described by Deputy Chief Nalbach was instituted, did not

receive training on positional asphyxia or sudden in-custody death syndrome.  Plaintiff argues

that the failure to provide this training to the officers caused Morales's death in that (1) the

officers did not immediately make an emergency request for an ambulance, (2) the officers

aggravated Morales's respiratory condition by placing him in a prone position to restrain and

handcuff him, and (3) prevented Morales from using his asthma pump.  In support of his claim,

Plaintiff has proffered three expert reports, which have not been challenged by the Jersey City

Defendants under <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).  Drs. Adelman and

Baden, forensic pathologists, give the opinion that Morales died as a result of an acute asthmatic

attack caused in part by the actions of the responding police officers.  Dr. Adelman notes "an

element of traumatic and positional asphyxia caused by the compression of Mr. Morales' chest

by the weight of the two brothers who subdued him and later by the police officers who

handcuffed him."  (Adelman Report at 5.)  Dr. Baden states that it is his opinion that the fatal

asthmatic attack was caused by the chase by the Sa-Onoy brothers, the officers' failure to give

Morales his asthma pump and their delay in calling for an ambulance.  Moreover, Plaintiff also

proffers two reports by an expert on police procedures, George Kirkham.  Kirkham points to the

fact that Officer Sarao heard Morales say "I can't breathe" while he was still engaged in a

struggle with the Sa-Onoys and that therefore both Officers Sarao and Cook were aware of

Morales's respiratory distress immediately upon arriving at the scene yet ignored these signs and

in fact exacerbated the condition by holding him in a prone position on the ground.  He opines

that the Jersey City Police Department's failure to train its officers in positional asphyxia and

sudden in-custody death, despite being well-known matters to the law enforcement community,

caused the officers to fail to recognize Morales's condition and ultimately caused Morales's

death.  Kirkham's reports state in relevant part:

> In my opinion, a direct causative factor in the death of Florencio Morales,
> Jr. was the failure of the Jersey City Police Department to train its officers
> to recognize and respond to the critical needs of suspects and others whom
> they were likely to encounter.  Sgt. Sarao, who had been a Jersey City
> officer since 1994, testified in deposition that he had never been trained
> regarding positional asphyxia, sudden in-custody death syndrome, excited
> delirium, or how to respond to a person experiencing breathing difficulty
> . . . Positional asphyxia and sudden in-custody death are phenomena that
> have been known to the law enforcement community since at least the late
> 1980s . . .

(Kirkham Report of Sept. 14, 2007 at ¶ 7.)

* * *

> [L]aw enforcement training academies and police agencies throughout the
> country long ago instituted training programs designed to familiarize
> officers with the condition and how to react to it from a life saving
> standpoint.  Such instruction emphasizes the importance of making every
> effort to avoid a physical struggle with a person who is showing signs of
> respiratory distress, including forcing them to the ground in a prone
> position (which greatly worsens their ability to breathe) and immediately
> summoning emergency medical assistance to the scene.

(Kirkham Report of Jan. 20, 2009 at 1.)

The evidence proffered by Plaintiff is sufficient to withstand the Jersey City Defendants'

motion for summary judgment on the failure to train claim.  A reasonable factfinder could

determine that Jersey City acted with deliberate indifference to the rights of Morales by failing to

train the responding officers in detecting and handling respiratory distress situations and thus, through the officers' incorrect actions, caused Morales's death.  The Court finds, however, that the evidence does not allow it to conclude that Morales prevails on the claim as a matter of law. The Jersey City Defendants have come forward with evidence which raises genuine issues of fact regarding both whether Plaintiff can establish that Jersey City acted with deliberate indifference, i.e., made what amounts to a policy decision regarding training, and whether Plaintiff can establish a causal link between the municipal action and his death.  Specifically, they rely on Dr. Mambo's autopsy report and accompanying toxicology report that the cause of death was multi-drug intoxication.  Moreover, they have also come forward with their own police procedures evidence, the report of their expert Edward Mamet, in rebuttal to Kirkham's opinion.[7]  Moreover, the Jersey City Defendants point to evidence that the Jersey City Police Department in fact does provide training on identifying and responding to individuals suffering from sudden in-custody death syndrome.

For these reasons, the Court will deny both Plaintiff's and the Jersey City Defendants' motions for summary judgment as to the Monell failure to train claim.

_____

[7] Plaintiff notes in his reply brief in support of his motion for summary judgment that the Jersey City Defendants served Mamet's report long after the deadline set by the Courts Scheduling Order of September 25, 2007.  Plaintiff requests that, pursuant to Federal Rule of Civil Procedure 37(b)(2), the Court preclude admission of this evidence.  However, Plaintiff has never moved to bar the witness testimony nor made any effort to demonstrate that under Third Circuit precedent this is the appropriate remedy.  See Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894 (3d Cir.1977), overruled on other grounds by Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir.1985))  Such relief will only be considered based upon a formal motion and briefing.

**B.**      **Plaintiff's New Jersey Tort Claims Against the Jersey City Defendants**

The Amended Complaint asserts a negligence claim against Officers Sarao and Cook

based on their failure to summon medical assistance promptly.  It also asserts assault and battery

claims against Officer Sarao based on the alleged excessive force with which he handled Morales

during the October 12, 2004 incident.  The Jersey City Defendants have moved for summary

judgment on these claims on the basis of good faith immunity under New Jersey's Tort Claims

Act. N.J.S.A. 59:3-3.

Under New Jersey law, tort liability against public entities and employees is governed by

the New Jersey Tort Claims Act.  N.J.S.A. 59:1-1, et seq.  The statute provides in relevant part

that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of

any law."  N.J.S.A. 59:3-3.   "The "objective reasonableness" standard that is used to determine

whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. §

1983 is used to determine questions of good faith arising under N.J.S.A. 59:3-3."  Hill v. Algor,

85 F.Supp.2d 391, 411 (D.N.J. 2000) (citing Lear v. Twp. of Piscataway, 236 N.J.Super. 550,

553-54 (App. Div. 1989)).   For the reasons discussed above, the Court finds that Officers Sarao

and Cook are entitled to good faith immunity on Plaintiff's negligence claims.  The Court also

finds Officer Sarao immune from liability for assault and battery.  While an officer may be liable

for assault and battery when he has used excessive force in making an arrest, the Court has

determined that the force used by Officer Sarao was objectively reasonable under the

circumstances.  Hill, 85 F.Supp.2d at 411 (citing State v. Williams, 29 N.J. 27 (1959)).

Moreover, although a public employee may not avail himself of immunity under the New Jersey

Tort Claims Act if his conduct "was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct", <u>N.J.S.A.</u> 59:3-14, Plaintiff has not raised an issue of fact as to whether statute's immunity-stripping provision applies here.  Accordingly, the Court grants summary judgment in favor of Officers Sarao and Cook on the state tort claims asserted against them.

Because the individual officers are not liable as a matter of law, Jersey City is likewise not liable for any tort claims based on the acts of the officers.  <u>N.J.S.A.</u> 59:2-2(b) ("A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.").  The Court will also grant summary judgment for Jersey City on the claims.

### C.    <u>Assault and Battery Claims Against Sa-Onoy Defendants</u>

The Court is presented with cross-motions for summary judgment on Plaintiff's assault and battery claims under New Jersey common law against the Sa-Onoy Defendants.  Finding material issues of fact as to these claims, the Court denies both Plaintiff's and the Sa-Onoy Defendants' motions in this regard.

There is no dispute that the Sa-Onoy Defendants tackled Morales and used some degree of force upon his body in an effort to restrain him.  New Jersey law defines a civil battery as "any non-consensual touching."  <u>Perna v. Pirozzi</u>, 92 N.J. 446, 460-61 (1983).  A cause of action for this intentional tort is satisfied by "proof of an unauthorized invasion of the plaintiff's person, even if harmless." <u>Id.</u> at 460-61.  The New Jersey appellate court has held that "[w]hile contact is essential to the cause of action, the intent required is satisfied 'not only if the defendant intends a

harmful contact, or an offensive contact, upon the plaintiff . . . (all of which are battery-type consequences) but also if the defendant intends only to cause apprehension that such a contact is imminent (an assault-type consequence).'" Kelly v. County of Monmouth, 380 N.J. Super. 552, 559 (App. Div. 2005) (quoting Prosser and Keaton, The Law of Torts (5th ed., 1984) § 9 at 39).

Defendants, however, argue that they were privileged to commit the battery in the exercise of a lawful citizen's arrest. The Court has consulted the authority cited to it by the parties, including New Jersey's model civil jury instructions, and conducted its own research. While there is scant authority in New Jersey jurisprudence on the topic, it appears that New Jersey espouses the common law doctrine of citizen's arrest. See State v. McCarthy, 123 N.J. Super. 513 (1973); New Jersey Model Civil Jury Instructions 320.C (setting forth charge of citizen's arrest as an affirmative defense to a false imprisonment claim, which involves use or threat of force). Under the common law, a citizen has the right to arrest without a warrant where a felony is provable and there are reasonable grounds to believe that the person arrested has committed a felony. Brown v. State, 62 N.J.L. 666 (1889); McCarthy, 123 N.J. Super. at 517. By statute, the right has been broadened to authorize a citizen's arrest for a disorderly persons offense when the offense was committed in the arresting citizen's presence. N.J.S.A. 2A:169-3; McCarthy, 123 N.J. Super. at 517. The Sa-Onoy Defendants argue that, pursuant to this authority, they were justified in physically restraining Morales, as the very definition of arrest contemplates the use of force. Indeed, Black's Law Dictionary defines "arrest" as a "seizure or forcible restraint." Black's Law Dictionary 116 (8th ed., 2004). Moreover, New Jersey law on citizen's arrest seems to be in line with the definition of the term provided in Black's: "An arrest

of a private person by another private person on grounds that (1) a public offense was committed in the arrester's presence, or (2) the arrester has reasonable cause to believe that the arrestee has committed a felony." Id.

The Sa-Onoys testified that they saw Morales exiting their backyard shed with a bag in his hand. Based on this, they argue that it is undisputed that they witnessed Morales committing the offense(s) of burglary, criminal trespass, theft by unlawful taking or disposition and/or assault, as those terms are defined by New Jersey's criminal code. The Court finds, however, that there are genuine issues of fact as to whether the Sa-Onoys witnessed an offense or had reasonable cause to believe that any of these claimed offenses had been committed, and moreover, that there are issues of fact as to whether it was Morales who had been seen exiting the backyard shed. Indeed, the record demonstrates varying descriptions of the person observed by the Sa-Onoy brothers in their yard and observed by neighbors fleeing the area.

Moreover, even assuming that the Sa-Onoy Defendants were engaged in a lawful citizen's arrest, the Court also finds issues of fact regarding whether the force they employed in effecting the arrest was reasonable. Though the Sa-Onoy Defendants testified that they only tackled Morales, to restrain him so that he could be arrested by police officers, Officer Sarao testified that when he arrived on the scene he saw the Sa-Onoys fighting with Morales, who was bleeding from the head or face area. With regard to the degree of force the Sa-Onoys were or were not authorized to use, both Plaintiff and the Sa-Onoys argue that they are entitled to summary judgment based on N.J.S.A. 2C:3-7, a provision of the New Jersey criminal code's chapter dealing with principles of justification. That provision sets forth the parameters of the justifiable

use of force by a private citizen to effect an arrest.  It provides in relevant part:

> a. Use of force justifiable to effect an arrest. Subject to the provisions of this section and of section 2C:3-9, the use of force upon or toward the person of another is justifiable when the actor is making or assisting in making an arrest and the actor reasonably believes that such force is immediately necessary to effect a lawful arrest.
>
> b. Limitations on the use of force.
>
> (1) The use of force is not justifiable under this section unless:
> (a) The actor makes known the purpose of the arrest or reasonably believes that it is otherwise known by or cannot reasonably be made known to the person to be arrested; and
>
> (b) When the arrest is made under a warrant, the warrant is valid or reasonably believed by the actor to be valid.

N.J.S.A. 2C:3-7.  Reliance on this provision is unavailing as to both sides' efforts to obtain summary judgment on the assault and battery claims.  Plaintiff argues that under the statute, the Sa-Onoys were not privileged to use any degree of force because there was no warrant for Morales's arrest.  Contrary to Plaintiff's reading of the statute, it does not limit the use of force to arrests made pursuant to warrant.  The Sa-Onoy Defendants, in turn, argue that the force they employed was justified under N.J.S.A 2C:3-7, and therefore Plaintiff cannot prevail as a matter of law.  The plain language of the statute renders this argument untenable.  The statute expressly provides that it governs only the affirmative defense of justification to criminal prosecution, stating that "[t]he fact that conduct is justifiable under this chapter does not abolish or impair any remedy for such conduct which is available in any civil action." N.J.S.A. 2C:3-1.  Justification pursuant to N.J.S.A. 2C:3-7 is simply not dispositive of Plaintiff's civil assault and battery claims.

In short, the Court finds that while the Sa-Onoy Defendants have raised material fact issues to controvert Plaintiff's assertion that they are liable as a matter of law for civil assault and battery, the record does not permit the Court to grant summary judgment in their favor, either. To negate the Sa-Onoys' liability on the assault and battery claims, questions of fact require resolution: were the Sa-Onoys authorized to make a citizen's arrest of Morales, and if so, did they exercise a reasonable degree of force in effecting the arrest.  These questions are properly left to a jury, and the Court therefore will deny the cross-motions on Plaintiff's assault and battery claims against the Sa-Onoy Defendants.

### D.       Florencio Morales, Sr.'s Wrongful Death Claim

The Jersey City Defendants move for summary judgment on the wrongful death claim brought against them by Morales's father, Florencio Morales, Sr.  They argue that no wrongful death action can lie because Florencio Morales, Sr. cannot demonstrate that Plaintiff's death was caused by the officers' negligence and because he cannot demonstrate that he suffered any pecuniary losses as a result of his son's death.

"The fundamental purpose of a wrongful death action is to compensate survivors for the pecuniary losses they suffer because of the tortious conduct of others." Smith v. Whitaker, 160 N.J. 221, 231 (1999) (quoting Alexander v. Whitman, 114 F.3d 1392, 1398 (3d Cir.1997)).  New Jersey's wrongful death statute provides, in relevant part:

> When the death of a person is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances amounting in law to a crime.

N.J.S.A. 2A:31-1.

Insofar as the statute applies to this case, a wrongful death action thus requires that Florencio Morales, Sr. establish that his son's death was caused by the negligence of the Jersey City Defendants. For the reasons that the deceased Morales's negligence claims against the Jersey City Defendants lack merit, Florencio Morales, Sr. cannot establish this essential element as a matter of law. Accordingly, the Court will grant summary judgment on the wrongful death claim in favor of the Jersey City Defendants.

The Court notes that the Sa-Onoy Defendants have not moved for summary judgment on this claim, although it has been asserted against all Defendants. The wrongful death claim against them will therefore proceed to trial.

**III.    CONCLUSION**

For the foregoing reasons, this Court adjudicates the motions for summary judgment at bar as follows: It denies Plaintiff's motion for partial summary judgment.  The Court grants the Jersey City Defendants' motion for summary judgment as to all claims against Officers Sarao, Cook and Crecco and as to the wrongful death claim against Jersey City.  It denies the Jersey City Defendants' motion as to the Monell failure to train claim against Jersey City.  The Court denies the Sa-Onoy Defendants' motion for summary judgment.

An appropriate form of order will be filed together with this Opinion.


　　　　　　　　　　　　　　 s/Stanley R. Chesler
　　　　　　　　　　　　　　STANLEY R. CHESLER
　　　　　　　　　　　　　　United States District Judge


DATED: July 7, 2009